The **BOARD OF REGENTS, Texas State University System,** Appellants,

v.

**Floyd L. MARTINE,** Appellee.

No. 13159.

Court of Civil Appeals of Texas, Austin.

Oct. 29, 1980.

Rehearing Denied Nov. 19, 1980.

Mark White, Atty. Gen., Nathan Johnson, Asst. Atty. Gen., Austin, for appellants.

Douglass D. Hearne, James H. Willmann, Hearne & Babb, Austin, for appellee.

SHANNON, Justice.

Appellants, The Board of Regents, Texas State University System, appeal from the judgment of the district court of Travis County that reversed the Board's order affirming the president's dismissal of appellee Floyd L. Martine from the faculty of Southwest Texas State University. The judgment set aside the order of the Board of Regents and further ordered that the Board reinstate Martine to his former tenured position as faculty member at Southwest Texas.[1]

Before April 29, 1975, Martine functioned as both Dean of Students and as a member of the faculty of the Department of Education at Southwest Texas. He obtained tenure as Associate Professor of Education in 1964. One of Martine's assignments as Dean of Students was to administer, off—

---

1. Martine appealed a previous judgment entered in this cause by the district court of Travis County. The opinion of the Tyler Court of Civil Appeals in that appeal is reported at 578 S.W.2d 465 (Tex.Civ.App.1979, no writ).

campus, the Blue Cross–Blue Shield Varsity Insurance Fund, a program of health insurance that existed for the benefit of the students attending Southwest Texas. On April 29, 1975, in response to a report from the State Auditor's Office concerning Martine's handling of the insurance fund, the University's president demanded Martine's resignation. Martine resigned, under compulsion, as Dean of Students on April 29, 1975. In addition, the president dismissed him as a member of the faculty. Martine appealed this dismissal to the "Faculty Hearing Committee," which recommended to the president that Martine be permitted to continue as a faculty member. The president refused to review the Committee's recommendation and passed the decision to the Board of Regents. On September 12, 1975, the Board of Regents ordered that Martine be dismissed as a member of the faculty.

The minutes of the Board's hearing show that the Board found by a "preponderance of the evidence" that:

(1) Martine's withdrawal of funds from the insurance fund for private purposes constituted moral turpitude;

(2) Martine's failure to account properly for expenditures from the insurance fund constituted "gross neglect of his professional responsibilities and professional incompetence."

The authority for the Board's findings is found in a publication by Southwest Texas entitled, "Faculty Handbook 1974–1975." That publication, under heading "Tenure and Promotion," provides *inter alia* that a tenured faculty member is assured of continuous employment unless removed "through due process for (1) professional incompetence, (2) moral turpitude, or (3) gross neglect of professional duties."

The Administrative Procedure and Texas Register Act, Tex.Rev.Civ.Stat.Ann. art. 6252–13a (1975), was not applicable to Martine's administrative appeal to the district court because that act "... was intended to apply only to administrative orders promulgated after January 1, 1976." *Merchants*

*Fast Motor Lines, Inc. v. Railroad Commission*, 573 S.W.2d 502 (Tex.1978).

■ Although there was no statutory authorization in 1975 for Martine to take an administrative appeal to district court from the Board's order, this does not mean he was without recourse to the courts since he had an inherent right to an administrative appeal. *Martine v. Board of Regents, supra*. The Tyler Court wrote in that opinion that judicial review of the Board's order "... would be limited to a question of law, i. e., whether the decision of the Board to dismiss [Martine] has support in substantial evidence as reflected in the proceedings before said Board." As this Court understands the opinion of the Tyler Court, and the law as it existed in 1975, Martine was entitled in district court to a "substantial evidence, de novo review." Pursuant to such review in the former practice, the district court heard evidence anew. The agency order was presumed valid and reasonably supported by substantial evidence, and the burden was on the party complaining to show that the order was not reasonably supported by facts existing at the time of the entry of the agency order.[2]

■ The burden upon one seeking to set aside an agency order is not impossible, although it certainly is not easy. Although the Board's order has a presumption of validity, it must be reasonably supported by substantial evidence. *Gerst v. Guardian Savings and Loan Association*, 434 S.W.2d 113 (Tex.1968). The Board is not empowered to use unbridled discretion. Its findings must be reasonably supported by substantial evidence; that is to say, the findings must not be arbitrary, capricious, and made without regard to the facts. *Gerst v. Guardian Savings and Loan Association, supra*.

■ This Court is not limited to a review of the evidence deemed favorable only to the Board, but instead is to review the record as a whole. *Railroad Commission v. Shell Oil Company*, 139 Tex. 66, 161 S.W.2d

2. Reavley, *Substantial Evidence and Insubstantial Review in Texas*, 23 Sw.L.J. 239 (1969).

1022 (1942). "Broadly speaking, the substantial evidence rule is a court review device to keep the courts out of the business of administering regulatory statutes enacted by the Legislature; but it remains the business of the courts to see that justice is administered to competing parties by governmental agencies." *Lewis v. Metropolitan Savings and Loan Association*, 550 S.W.2d 11, 13 (Tex.1977).

The Board's complaint of the judgment is that the district court erred in concluding that the Board's order was not supported by substantial evidence. The Board urges particularly, that there *was* substantial evidence to support their finding that Martine's conduct constituted moral turpitude. The Board's case is pitched upon the following syllogism: Martine's use of the funds constituted theft pursuant to Tex. Penal Code Ann. § 31.03 (1975); the crime of theft involves moral turpitude; therefore, Martine's conduct involved moral turpitude.

Prior to Martine's appointment, the student insurance program had been administered on campus using funds, employees, and office facilities of the University. Immediately prior to Martine's appointment, the administration of the University concluded that the insurance program was a private endeavor and that the University officials could be criticized for using University employees and funds in the administration of the program. Martine's orders were to run the program "off–campus." Although Martine was expected as Dean to administer the insurance program, he did not receive any assistance from the University. The University did not lend financial assistance, and none of its officials ever furnished Martine any guidelines or recommendations as to how he should run the program. Likewise, the insurance company never bestirred itself to train Martine about the mechanics of setting up the program and keeping a set of records.

Martine acted as Dean from 1967 until 1975. In 1967, the enrollment was about seven thousand students and at that time the insurance company paid Martine eighteen cents from each student's premium to cover the expenses of administration. The sum allowed was increased later to a maximum of $1.16.

Information concerning the insurance program was disseminated by one of two methods: by mail and by part–time student employees handing out brochures to students in dormitories and in line waiting to register. In the beginning, Martine limited payment for expenses to postage and compensation to the part–time student help. His own children stuffed the envelopes free of charge and his secretary kept the accounts after hours without compensation. In this manner, Martine was able to pay in the first year the expenses of administering the program from the sum allowed by the insurance company.

As the enrollment of the University increased, the amount of mailing, part–time student help, and secretarial time increased. By 1971, Martine mailed out about twenty–one thousand pieces of mail to students and prospective students. Although the enrollment of the University increased, the enrollment in the insurance program did not grow commensurate with the growth of the student body so as to allow Martine greater sums of expense money from the insurance company. Because of the increased volume of work, Martine no longer felt justified in asking his secretary to donate her time to the program. By 1971, he commenced payments to her and the envelope stuffers for time spent working on the insurance program.

After 1967, Martine was never able to meet the expenses of administering the program from the sum allowed by the insurance company. Although Martine complained to the insurance company that the expenses were greater than the amount received to pay the expenses, the insurance company refused to increase the allowable for expenses. After 1967, Martine's uncontradicted testimony was that he made up the difference between the cost of the program and the sum for expenses allowed by the insurance program by payment from his own pocket. His testimony was that over the years, he paid five to six thousand dol-

lars from his own funds to keep the program afloat.

Premiums received from the students were placed in a local bank account to the credit of "Blue Cross Varsity Insurance Fund." Only Martine was entitled to write checks on the account. The insurance company requested Martine to make payment of the premiums in two installments, one–half in November and the other half in March or April. Martine paid the expenses of administration from the insurance account.

In 1969, Martine decided to make "temporary" use of the insurance funds for his own purposes. He considered his personal expenditures for administration of the insurance program to be interest on the funds that he withdrew and used. Martine used the insurance funds to apply to loans that he had on some farm equipment. When time would come to make a premium installment to the insurance company, he would replace the money he had withdrawn.

All funds were accounted for to the insurance company. No payment to the insurance company was ever late. No one from the insurance company ever complained of his administration of the program; in fact, the insurance officials were complimentary of Martine's operation.

State auditors called Martine's administration of the program to the attention of the University's president, Dr. Lee H. Smith. Dr. Smith had become president of the University subsequent to Martine's appointment as Dean. The auditor's view, which became Dr. Smith's view, was that the funds were State funds and that Martine had made improper use of them.

Martine called a host of professors, former educators, and administrators at Southwest Texas. The evidence established that from about 1967 to 1975, the insurance program was an "off–campus" activity not involving State funds or State time. The administration's conviction that the program was private was the reason that the program was ordered off–campus in 1966 or 1967. There was proof that the administration of the insurance program was not a professional responsibility of a member of the teaching staff of the University. Several professors testified that Martine was a quality professor and that his administration of the insurance program had not affected his ability to teach. The State tendered no evidence that Martine's administration of the program affected his ability to teach.

It is not clear, whether the insurance company or the student enrollees, was entitled to the premium funds in the bank account. In any event, the record clearly establishes that the administration of the insurance program was a concern of the insurance company, the student enrollees, and Martine. It is of interest that neither the insurance company nor any of the students has complained of Martine's administration of the funds.

Nevertheless, Martine's temporary use of the funds was neither wise nor proper. As administrator of the program, he was acting in a fiduciary capacity for either the students or the insurance company. As such, he could not permissibly use the beneficiaries' funds for his own personal gain. As a fiduciary, he had a duty to account to the beneficiary for all of the funds coming into his possession. This he has done, to the apparent satisfaction of the beneficiaries.

Contrary to the Board's argument, the task for this Court in the resolution of this appeal is not to determine whether the elements of theft were shown. That responsibility is lodged elsewhere. In that connection, it should be observed that, given the facts of this case, it is not surprising that the district attorney chose not to prosecute.

A term such as "moral turpitude" covers so wide a range that it could embrace an unlimited scope of conduct. An agency is not empowered to dismiss an employee whose personal or private conduct incurred the agency's displeasure. Rather, courts consistently relate such terms as "moral turpitude" to the issue of whether the employee's conduct has disqualified him, when applied to the performance of the employee in his particular type of job.

Morrison v. State Board of Education, 1 Cal.3d 214, 82 Cal.Rptr. 175, 461 P.2d 375 (1969); Hale v. Board of Education, City of Lancaster, 13 Ohio St.2d 92, 234 N.E.2d 583 (1968); Jarvella v. Willoughby–Eastlake City Sch. Dist., 12 Ohio Misc. 288, 233 N.E.2d 143 (Ohio Com.Pl.1967). Courts accord such broad terms as "moral turpitude" more precise meaning by referring in each case to the particular profession or occupation to which the term is applicable. Muniz v. State, 575 S.W.2d 408, 411 (Tex.Civ.App. 1979, writ ref'd n. r. e.). In the teaching profession, the inquiry becomes one of whether the teacher's private conduct bears a direct relationship to his ability to teach. In different terms, what is the likelihood that the employee's conduct may have adversely affected students or fellow teachers. Morrison v. State Board of Education, supra.

■ This Court has reviewed the record as a whole. Railroad Commission v. Shell Oil Company, supra. Although Martine's breach of his fiduciary duty to the insurance company or student enrollees was improper, there was no evidence that such breach bore a direct relationship to his ability to function as a teacher, nor was there evidence that it adversely affected the students at the University or his fellow teachers.

The Board has other points, none of which are meritorious, and all of which are overruled.

The judgment of the district court is affirmed.

PHILLIPS, C. J., not sitting.