628 S.W.2d 832 (1982)
GENERAL TELEPHONE COMPANY OF THE SOUTHWEST, Appellant,
v.
PUBLIC UTILITY COMMISSION OF TEXAS, Appellee.
No. 13491.
Court of Appeals of Texas, Austin.
February 10, 1982.
Rehearing Denied March 3, 1982.
*833 Ward W. Wueste, Jr., San Angelo, for appellant.
Mark White, Atty. Gen., Martha V. Terry, Asst. Atty. Gen., Austin, for appellee.
PHILLIPS, Chief Justice.
This is an appeal in a rate case by General Telephone of the Southwest from a judgment rendered in favor of the Public Utility Commission of Texas by the trial court.
There are two principal questions for decision. The first is whether appellant General Telephone of the Southwest, a wholly-owned subsidiary of the parent holding company GTE, must bear an imputed share of the debt portion of GTE's capital structure thereby reducing the rate of return allowed on the adjusted value of appellant's invested capital below what it alleges is a fair and reasonable level. This is commonly called "double leveraging." The Commission, appellee found that it must.
*834 The second major question is whether the Commission's order is correct in imputing a share of the debt portion of GTE's capital structure to appellant, thereby increasing the amount of fixed charges (interest) taken as a deduction in determining federal income tax expense which allegedly reduced such expense, for ratemaking purposes, below the level actually incurred by appellant.
These questions must be determined under the Public Utility Regulatory Act, (hereinafter referred to as PURA or the Act) Tex.Rev.Civ.Stat.Ann. art. 1446c (1980).
The trial court affirmed the Commission's order in all respects and this Court affirms that judgment.
Appellant, a corporation chartered under the laws of the State of Delaware, holds a certificate of public convenience and necessity from the Commission to provide telecommunications service as a public utility to various designated areas throughout the State of Texas. It is also a wholly-owned subsidiary of GTE; that is, GTE owns 100 percent of appellant's common equity. The balance of appellant's securities,preferred stock, first mortgage bonds, and debentures, are publicly held.
GTE is a holding company with numerous domestic and foreign subsidiaries engaged in diverse operations ranging from manufacturing of the familiar Sylvania light bulbs and flashcubes to the provision of telephone utility service. All components of GTE's capital structurecommon equity, preferred stock, first mortgage bonds, and debentures, are publicly held.
Appellant complains of the Commission's use of the "double leverage" methodology used in lieu of appellant's own capital structure to calculate both the rate of return on invested capital and appellant's federal income tax expense.[1]
*835 Appellant provides telecommunication service to customers located in suburban areas around Houston and Dallas-Ft. Worth metroplexes, as well as smaller cities such as San Angelo, Texarkana and Georgetown. It contends it is the fastest growing telephone company in the State of Texas. In addition, appellant alleges a constant need to increase its investment in telephones, cables, and other physical plant necessary to meet growing demands for service from its business and residential customers. To meet these demands, appellant claims the need to seek hundreds of millions of dollars externally in the highly competitive securities market. Appellant contends, that as a result of the Commission's actions, it has been denied additional annual revenue totalling $10,940,948.

I.
Appellant's first point of error is that the trial court erred in affirming the order of *836 the PUC because, in determining (1) the appropriate rate of return on the value of appellant's invested capital, and (2) federal income tax expense, the Commission imputed a portion of the debt and preferred stock of GTE to appellant, and thereby acted in excess of its statutory authority under PURA. All further statutory references in this opinion shall be to PURA unless otherwise noted.
As stated therein at § 2, the legislature enacted PURA §§ 1-91 to create "a comprehensive regulatory system" for utilities operating within this State. Consistent with this legislative purpose, our Supreme Court has construed the Act as a whole.[2]
Section 3(i)(1) defines the terms "affiliated interest" or "affiliate" as "any person or corporation owning or holding, directly or indirectly, five percent or more of the voting securities of a public utility." Subsection (i)(2) extends the definition to include any person or corporation in any chain of successive ownership of five percent or more of a utility's voting securities.
Appellant contends the Commission's broadest powers with respect to transactions with affiliates are set forth in PURA, § 41(c) wherein, it contends, the legislature specifically directed that transactions with affiliates be considered in determining a utility's net income for ratemaking purposes. This section of the Act provides in relevant part as follows:
(c) Net income. By "net income" is meant the total revenues of the public utility less all reasonable and necessary expenses as determined by the regulatory authority. The regulatory authority shall determine expenses and revenues in a manner consistent with the following:
(1) Transactions with Affiliated Interests. Payment to affiliated interests for costs of any services, or any property, right or thing, or for interest expense shall not be allowed either as capital cost or as expense except to the extent that the regulatory authority shall find such payment to be reasonable....
(2) Income Taxes. If the public utility is a member of an affiliated group that is eligible to file a consolidated income tax return, and if it is advantageous to the public utility to do so, income taxes shall be computed as though a consolidated return had been so filed and the utility had realized its fair share of the savings resulting from the consolidated return, unless it is shown to the satisfaction of the regulatory authority that it was reasonable to choose not to consolidate returns. The amounts of income taxes saved by a consolidated group of which a public utility is a member by reason of the elimination in the consolidated return of the intercompany profit on purchases by the public utility from an affiliate shall be applied to reduce the cost of the property or services so purchased....
Appellant further contends that beyond the ratemaking principles set forth in § 41(c), the scope of the Commission's jurisdiction over affiliates is defined by § 67. As provided therein, jurisdiction has been conferred on the Commission over affiliates "to the extent of access to all accounts and records of such affiliated interests relating to [affiliated] transactions."
Appellant argues that nowhere does the statute vest the Commission with authority to inquire into the affiliate's capital structure or the costs of its investment funds, or to use such information in determining a reasonable rate of return on the invested capital of jurisdictional utilities.
Appellant points out that an administrative agency, such as the Commission, is entirely a creature of the legislature. Appellant then contends that as such the Commission possesses only those powers specifically delegated to it. Railroad Commission v. City of Austin, 524 S.W.2d 262 (Tex. 1975); Humble Oil and Refining Co. v. Railroad Commission, 128 S.W.2d 9 (Tex.1939); Commercial Standard Insurance Co. v. Board of Insurance Commissioners, 34 S.W.2d 343 (Tex.Civ.App.Austin 1930, writ ref'd).
*837 The substance of the Commission's authority with respect to the subject matter before us, according to appellant, is contained in § 41(c) set out above. There under subsection (1), the Commission is required to determine the reasonableness of affiliated transactions for ratemaking purposes. The legislature listed the categories of transactions subject to commission jurisdiction. Any transaction relating to services to the affiliate or sale, lease, or other transfer of property, rights, or things are to be reviewed. Even loans from the affiliate fall under the Commission's scrutiny.
Appellant next contends that one category is missing. That is the category of ownership. The legislature never granted the Commission any power in the PURA to determine or regulate where the utility's parent obtains its funds for investment in the common stock of the utility.
Under Sec. 41(c), subsection (2), the Commission is empowered to inquire into the tax savings which may be realized through the filing of a consolidated federal income tax return by a utility and its affiliates even if such a consolidated return is not filed. Upon a finding of such savings, the Commission is directed to apply them to reduce the price of products or services purchased by the utility from the affiliate and to apply the investment tax credit against federal income tax to reduce the rate base to the extent allowed by the Internal Revenue Service. No authority is conferred to reduce the utility's federal income tax expense to reflect the effects of debt in affiliates' capital structures.
Appellant analogizes this situation to the general rule that the express mention or enumeration of one person, thing, consequence, or class is equivalent to an express exclusion of all others.[3] Thus, in appellant's view, the Commission's jurisdiction over affiliates is limited to those powers specifically conferred.
We do not agree with appellant's argument. In determining the level of return to be earned by a utility, the Commission must consider the impact a utility's particular financial structure may have upon the cost of capital to that utility. In setting the level of return the company is entitled to earn, it is necessary to determine whether the company's status as a wholly-owned subsidiary of GTE, with no publicly traded common stock, has any special importance for return purposes. If so, the regulator must select an appropriate capital structure formula which recognizes this status. These issues are not unique to Texas and have been repeatedly met in other regulatory jurisdictions.
The independent company analysis, urged by appellant, is one method. The remaining methods are generally applied in utility holding company cases. These latter methods are usually denominated "double leverage" analysis because they recognize and adjust for the leverage available to a parent corporation when it finances capital in its wholly-owned subsidiary. The precise methodology chosen by the Commission in this case will be discussed later in this opinion.
Much of the utility industry consists of holding company arrangements in which the utility operating company is the subsidiary of a parent corporation.[4] The relationship between parent and subsidiary varies from the simple operating division to a subsidiary the majority of whose stock is held by a parent and whose minority-share-holdings may or may not be publicly traded. Most regulatory jurisdictions faced with the public policy question of how to treat utility holding companies have elected to allow the ratepayer to benefit from the additional leverage utilized by the parent. These jurisdictions employ some type of double leverage analysis to adjust a utility's capital structure so it reflects the true cost of *838 capital of the wholly-owned subsidiary.[5] Double leverage methodology recognizes the financing of equity for a subsidiary does not result from the impersonal forces of the financial market but rather from board-room decisions made by a parent corporation which controls, to a great extent, the ultimate cost of a subsidiary's equity.
As noted above, appellant advocated an independent company analysis which returns to the parent a total revenue figure based upon the assumption the parent's cost of capital in the subsidiary consists of nothing but equity capital cost. The independent entity analysis treats the subsidiary as though it were standing alone and computes its cost of capital on the basis of the subsidiary's book figures as a weighted average of its debt costs and its cost of equity both common and retained earnings.
The Commission used the double leverage source of funds approach which was testified to in detail by expert witness Loconto. His analysis recognizes the leverage used by the parent in financing its subsidiary's cost of capital by determining the different sources of capital invested in the subsidiary and their various costs. The approach assumes the parent corporation finances its subsidiary's equity capital in proportion to its own debt and equity and imputes that levered cost of equity as the cost of equity to the subsidiary.
In light of the Commission's public policy decision to pass the benefits of double leveraging on to the company's ratepayers, we come to the point where we must decide whether the Commission has the constitutional and statutory authority to proceed as it did.
At the outset, it must be reiterated the Commission, through its use of the source of funds analysis, does not regulate the parent company, GTE. The Commission does not require GTE to perform any affirmative duty or act, nor has the Commission imposed any obligation upon GTE. In determining the return to be earned by appellant, the Commission has merely considered and used the parent corporation's capital structure, nothing more.
There is no statutory provision in PURA which expressly authorizes or prohibits consideration of the parent's capital structure. As we stated above, the appellant contends the Commission is a creature of the legislature having only those powers expressly delegated to it. The appellant then argues that, because the power to impute affiliate parent debt and equity to the subsidiary utility is not delegated, the Commission's use of a source of funds methodology is in excess of its statutory authority.
The appellant is correct that the provisions of PURA distinguish between the Commission's jurisdiction over utilities and its jurisdiction over affiliates; however, we cannot agree with its conclusion that from the lack of express authorization in PURA to consider the capital structure of the company's parent affiliate, GTE, the Commission may not consider the capital structure *839 of appellant's parent for the purposes of determining to what return appellant is entitled.
In the recent case of Railroad Commission of Texas v. Entex, 599 S.W.2d 292 (Tex.1980), the court held:
Another factor in determining a reasonable rate of return is the utility's financial structure.
* * * * * *

The importance of considering the return to book common equity in a fair value jurisdiction can be easily demonstrated. Debt and preferred stock costs are not affected by inflation because the utility's obligation to the investor remains the same. Even with an increase in the adjusted value rate base, the holder of debt or preferred stock will not realize a greater return on the initial investment. Because the cost of this type of capital remains fixed, additional return to the utility due to an adjusted value rate base will go to the equity holder or common stock investor. An exorbitant return to the common stock equity could be considered by the Commission in determining a reasonable rate of return, however, the basic legal requirements for a rate of return must be satisfied. 599 S.W.2d at 295. (Emphasis added)
The legislature has given state regulatory commissions the broad authority to regulate the return to be earned by a utility. In Humble Oil and Refining Co. v. Railroad Commission of Texas, 128 S.W.2d 9, 15 (Tex.1939), the Court made the following statement:
[O]ur holding to the effect that the Commission is without jurisdiction to tell a mere gas producer what price he must charge for his product when sold on the premises of production to a public gas utility does not mean that the Commission in all instances and under all circumstances, in fixing gas utility rates, must allow the gas utility affected full credit for the purchase price of the gas purchased by it. In regard to that matter we think that, in fixing gas utility rates, it is not only the power but the duty of the Commission to inquire into the reasonableness or unreasonableness of the gas utility's gas contracts. (Emphasis added)
By analogy, simply because the Commission does not have express authority to regulate appellant's financial relationship with its parent GTE does not mean the Commission may not "inquire into the reasonableness or unreasonableness" of appellant's relationship with its parent for the purpose of setting rates. The power asserted by the Commission in this case may be necessarily implied from the authority conferred, or the duties imposed upon the Commission by the legislature. See, Stauffer v. City of San Antonio, 162 Tex. 13, 344 S.W.2d 158 (1961).
It must be noted that section 89 of PURA states PURA must be liberally construed. Section 28(a)(1) of the Act is as follows:
Sec. 28. (a) The Commission and the railroad commission shall have the power to:
(1) require that public utilities report to it such information relating to themselves and affiliated interests both within and without the State of Texas as it may consider useful in the administration of this Act; ... (emphasis added)
Section 28 contains no limitation or "subject to" provision. Section 28(a) gives the Commission the authority to require a utility to divulge information about itself and its affiliated interests while section 67[6] grants the Commission jurisdiction over affiliated interests having transactions with public utilities only to the extent of inspection of records concerning those transactions. Section 67 is not to be interpreted as a limitation of Section 28(a) because the *840 entities over which commission jurisdiction is granted are different.
Further, PURA section 16 provides:
The commission has the general power to regulate and supervise the business of every public utility within its jurisdiction and to do all things, whether specifically designated in this Act or implied herein, necessary and convenient to the exercise of these powers and jurisdiction. (emphasis added)
This section does not indicate the legislature intended that the Commission could exercise only those powers expressly granted by the Act.
In answer to appellant's contention that section 41(c) prohibits the Commission's consideration of the parent's capital structure because such power is not enumerated within the provisions contained in that section, Section 41(c)(1) has nothing to do with the issue of whether the Commission may adjust the capital structure of a subsidiary to reflect actual capital costs. That section points only to those instances in which a utility makes a payment to an affiliated interest for the "... costs of any services or any property, right or thing, or for interest expense." If Section 41(c)(1) can somehow be interpreted to control the Commission's power to adjust the appellant's capital structure, surely the terms "costs for... right or thing" are inclusive enough to permit the consideration of, and where appropriate, the adjustment of, a subsidiary's capital structure.
The appellant's arguments concerning the appropriate interpretation to be given to 41(c)(2) are also unpersuasive. That provision specifically provides that, when a consolidated tax return is filed or is appropriate to be filed for the utility and its affiliate, the tax savings resulting from that consolidated return are to be passed along to the utility's ratepayers. This provision for a consolidated income tax return treats the utility and its affiliate as one. Even if the utility elects not to file a consolidated return for itself and its affiliate(s), the Commission is given the power under that section to compute the utility's tax expense as though it had.
Further, this section addresses the issue of savings resulting from consolidated income tax returns. It is undisputed that the appellant and its parent, GTE, file a consolidated income tax return. By virtue of that consolidated return, the company receives the benefit of the deduction of interest on parent debt for tax purposes. Pursuant to the provisions of section 41(c)(2), the Commission is authorized to pass the benefits of that tax saving to the company's ratepayers.
We hold the portions of PURA which determine an appropriate return to be earned by a utility are sections 39 and 40(a). See Entex, supra. Section 41 of the Act and its various subsections concern the evaluation of property to be included in a utility's ratebase and the authority of the Commission to disallow expenses for ratemaking purposes. Sections 41(c)(1) and 41(c)(2) concern the expense portion of revenue recovery authorized by Section 39 of the Act. Neither Section 41(c)(1) nor section 41(c)(2) involve the power or the authority of the Commission to determine an appropriate capital structure for a utility for return purposes.
The cases relied upon by appellant are not helpful. In Railroad Commission v. City of Austin, supra, the court refused to imply power to the Commission to determine property rights or set aside delivery contracts and the Humble case has already been discussed above.

II.
Appellant's second point of error is that the trial court erred in affirming the Commission's order because the Commission's application of the "double leverage" methodology, to determine the appropriate rate of return on the value of appellant's invested capital, acts to deny appellant equal protection of the laws under the Fourteenth Amendment of the U. S. Constitution.
Appellant contends that the result of the act of the Commission, in "double leveraging" *841 its wholly-owned facility, was to allow appellant a lower rate of return on invested capital than would have been allowed if appellant's own capital structure and its actual common equity component had been used. It contends this action denies it the equal protection of the laws, as the double leverage methodology has not been applied to other telephone utilities on the basis of a "totally irrational distinction," namely, the number and identity of their common equity owners.
Appellant then cites us to Application of Mountain States Telephone Co., Commission Docket No. 3,040 (August 1980). There, we are told, the capital structure used by the Commission to determine an appropriate rate of return for Mountain States was the actual capital structure of Mountain States. The separate capital structure of Mountain States' corporate parent, American Telephone and Telegraph Co. (AT&T) was not considered.
Appellant then argues it has long been settled that the Fourteenth Amendment's guarantee of equal protection applies to corporations as well as individuals.[7] Furthermore, it applies to the acts and decisions of state officials, boards, and agencies as well as to state legislative enactments.[8] The equal protection clause prohibits arbitrary discrimination; it requires, in essence, that persons similarly situated in regard to a state law or other action must be similarly treated.[9]
We have no quarrel with the cases appellant has cited in support of its equal protection argument, however, we find them irrelevant.
To prevail in a claim of discrimination, appellant must show that the Commission has treated similarly situated parties differently. The appellant readily admits that it is wholly-owned as opposed to Mountain States which has minority shareholdings which are publicly traded. Appellant fails to respond to the Commission's position that the treatment of appellant's capital structure by the Commission is consistent with the Commission's treatment of all other wholly-owned telephone subsidiaries appearing before it.
It is conceded, the "source of funds" methodology, used to adjust the capital structure in this case, is an inappropriate analysis to apply to a company which is not wholly-owned but has significant minority shareholdings which are publicly traded.
In determining a utility's ability to raise capital on the financial market, the fact the entity offering the utility service may be publicly traded, may be a sole proprietorship, or may be a non-profit cooperative is of significant importance in determining that particular utility's ability to attract capital. It is for this reason, among others, that the Commission is charged with the duty to set rates for individual companies and not with the duty to set a single schedule of rates that apply to an entire industry. See, Application of Gulf States United Telephone Co. for Rate Increase, Commission Docket No. 120 (March 1977); Application of Continental Telephone Co. of Texas for Rate Increase, Commission Docket No. 1,529 (May 1978); Southwestern Bell Telephone Co. v. Public Utility Commission of Texas, 615 S.W.2d 947 (Tex.Civ.App.Austin 1981) writ ref'd n. r. e. per curiam 622 S.W.2d 82 (Tex.1981).
Appellant's point of error number three is that the trial court erred in affirming the Commission's order because the *842 Commission's use of the source of funds methodology to determine the true cost of capital of the company constituted confiscation of the company's property denying the company due process of law, as proscribed by the Fourteenth Amendment to the United States Constitution.
Appellant's third point of error goes on to claim that the court erred in affirming the order of the P.U.C. because the Commission's application of the "double leverage" methodology to determine the appropriate rate of return on the value of appellant's invested capital results in rates for utility service which are unreasonably low and confiscatory, thereby denying appellant due process of law prescribed by the Fourteenth Amendment of the U. S. Constitution and art. 1, § 19 of the Texas Constitution.
Appellant cites Bluefield Water Works and Improvement Co. v. Public Service Commission, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923) and Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), contending that neither of these decisions permits an inquiry into either the source or the cost of an investor's capital. The company further contends, because Hope was a wholly-owned subsidiary of Standard Oil Company of New Jersey and because a leveraging analysis was not used in determining its return, the U. S. Supreme Court has concluded recognition of the parent-subsidiary relationship is inappropriate and confiscatory in determining return. We do not agree.
Neither the issue of the propriety of leveraging techniques used by a parent to acquire junior equity in the subsidiary, nor the question of whether such techniques produced excessive returns to the common stockholders was before the Supreme Court in either of those cases.
The appellant complains of the source of funds approach used by the Commission, arguing that the comparable earnings and capital attraction test mandated by the Alvin, Hope and Bluefield cases cannot be met by performing a comparable earnings test on GTE.
The Commission, supported by evidence, utilized a discounted cashflow analysis which is designed to satisfy the capital attraction test portion of the two-pronged standard contained in Hope, Alvin and Southwestern Bell to test the validity of the method used. Indeed, the Commission's expert witness Loconto testified the appellant's books contain no helpful information with regard to earnings per share, dividends per share, average common equity, fixed charge coverage, or interest coverage.
As the trier of fact, the Commission chose to believe Loconto's testimony that it could not apply the comparable earnings test advocated by appellant.
Appellant's fourth point of error is that the court erred in holding the Commission's order was supported by substantial evidence.
Appellant complains of the Commission's finding that it is reasonable to assume GTE purchase of appellant's common stock is supported by debt and equity in amounts approximately those of the parent's overall capital structure. Appellant contends when the record as a whole is examined this assumption is proven false. We think not.
The burden rests upon the applicant to justify the increase which it seeks. In the instant case, two of the three expert witnesses testified some type of adjustment to appellant's capital structure was necessary to recognize the appellant's status as a wholly-owned subsidiary of GTE. Two of these witnesses recognized appellant could earn excessive returns if the parent's leveraging of capital costs were ignored. Even appellant's witness recognized the parent would earn more than the return set for the subsidiary if some type of double leverage were not used, although he refused to employ a double leverage methodology recommending the company be treated as an independent company standing alone. Thus the appellant has not carried its burden of justifying the increase, given the above-mentioned admission by its own witness that it will earn more than its fair share if some sort of double leveraging is not used.
*843 The source of funds approach assumes the subsidiary's equity is supported by debt and equity in proportion to the debt and equity contained in the parent structure. This is so because it is impossible to trace all dollars contributed in incremental investments by the parent to the subsidiaries. In essence, the risk characteristics of the subsidiaries are inherent in the cost of capital to the parent.
The appellant attempts to demonstrate that debt was not used to acquire all subsidiaries. However, witness Loconto testified to the effect that if one looks at the manner in which the appellant issues at the corporate level, and even at the subsidiary levels, it is done on a consolidated basis and the capital structure is balanced in the total as opposed to balanced for any one entity. Loconto further stated that even though that particular transaction claimed by appellant might have taken place, either with stock or cash or whatever, the actual company is financed as a total entity and, therefore, the double leverage will still apply.
An appeal from an order of the P.U.C. is governed by the substantial evidence rule. Southwestern Bell Telephone Co. v. Public Utility Commission, 571 S.W.2d 503 (Tex.1978). Because the agency order is presumed to be supported by substantial evidence, it was appellant's burden to overcome that presumption. City of San Antonio v. Texas Water Commission, 407 S.W.2d 752 (Tex.1966). The burden upon one seeking to set aside an agency order is not impossible, although it certainly is not easy. Board of Regents v. Martine, 607 S.W.2d 638 (Tex.Civ.App.1980, writ ref'd n. r. e.). Substantial evidence need not be much evidence, and although "substantial" means more than a mere scintilla, or some evidence, it is less than it required to sustain a verdict being attacked as against the great weight and preponderance of the evidence. Mutual Bldg. and Loan Ass'n v. Lewis, 572 S.W.2d 771 (Tex.Civ.App.1978, no writ); Reavley, Substantial Evidence and Insubstantial Review in Texas, 23 Sw. L.J. 239 (1969). If there existed substantial evidence which would have supported either the grant or denial of the application, the agency order should be sustained. Texas Aeronautics Commission v. Braniff Airways, Inc., 454 S.W.2d 199 (Tex.1970).
Appellant's fifth point of error is that the court erred in disregarding appellant's rightful status as a distinct corporate entity without support of substantial evidence.
Appellant contends that by using the source of funds analysis to determine the appellant's true cost of capital, the Commission has improperly "pierced the corporate veil" of the Company and its parent, GTE. Appellant argues there is no showing in the record that the corporate entity was used as a sham to perpetuate fraud, to avoid personal liability, to avoid the effect of a statute etc., and, therefore there is no substantial evidence contained in the record to support the Commission's double leverage analyses.
There is no doubt corporations may be regulated by the legislature.[10] The legislature in section 2 of the Act was declared that public utilities are monopolies and, in enacting the Act regulating utility corporations, has seen fit to exercise its prerogative to regulate the business affairs of utilities within the State. No further authority is necessary to enable the Commission to examine the parent-utility subsidiary relationship. The subject has been foreclosed by the enactment of the Act. The burden is upon the appellant, not the Commission, to justify its rate increase request.
The judgment of the trial court is in all things affirmed.
NOTES
[1] Traditionally, regulatory commissions have calculated the appropriate rate of return on the value of a utility's investment by adding together the weighted costs of the various components of the utility's capital structure. Had such a method been used by the Commission in the present case a rate of return of 11.13 percent would have been calculated for appellant based upon the following year-end 1979 capital structure.

 TABLE 1
 GENERAL TELEPHONE COMPANY OF THE SOUTHWEST
 CAPITAL STRUCTURE & COST OF CAPITAL BEFORE
 "DOUBLE LEVERAGE" ADJUSTMENT 
 Percent
 of Weighted
 Amount Total Cost Cost 
GTSW Long-Term Debt $ 497,481,000 45.11 8.54 3.85
GTSW Short-Term Debt 77,829,000 7.06 14.07 .99
GTSW Preferred Stock 80,218,000 7.27 8.39 .61
GTSW Retained Earnings 112,296,000 10.18 14.00* 1.43
GTSW Common Stock 335,000,000 30.38 14.00* 4.25
 _______________ _____
 $1, 102,824,000 11.13
* Assumes a cost of equity of 14 percent as found by the Commission.

Under the "double leverage" methodology, however, a composite capital structure, composed of elements of the year-end 1979 capital structures of appellant and GTE, was used in lieu of appellant's own capital structure to calculate the rate of return on invested capital. This composite capital structure was developed through the following steps:
First, the following year-end 1979 capital structure for GTE was determined:

 TABLE 2
 GTE (PARENT ONLY) CAPITAL STRUCTURE
 Percent of
 Amount Total 
Long-Term Debt $ 725,456,000 18.87%
Short-Term Debt 402,073,000 10.46
Preferred Stock 363,904,000 9.46
Common Equity 2,353,844.000 61.21
 _______________ _______
 $ 3,845,277,000 100.0%

Next, the percentages of the components of GTE's capital structure were applied to appellant's common stock of $335,000,000 to produce the common stock surrogate in the composite capital structure:

 TABLE 3
 GENERAL TELEPHONE COMPANY OF THE SOUTHWEST
 IMPUTED COMMON EQUITY COST 
 Percent
 of Adjusted Weighted
 Total Amount Percent Cost Cost 
GTE Long-Term Debt 18.87 $ 63,214,000 5.73 7.72 .44
GTE Short-Term Debt 10.46 35,041,000 3.18 13.68 .44
GTE Preferred Stock 9.46 31,691,000 2.87 8.78 .25
GTE Common Stock 61.21 205,054,000 18.60 14.00 2.60
 ______ ____________ ______
 100.00 $335,000,000 30.38

After adding back appellant's retained earnings totalling $ 112,296,000 to the common stock component of Table 3 to arrive at appellant's common equity of $317,350,000. Tables 1 and 3 were combined to produce the composite capital structure shown on Table 4:

 TABLE 4
 GENERAL TELEPHONE COMPANY OF THE SOUTHWEST
 CAPITAL STRUCTURE & COST OF CAPITAL
 AFTER DOUBLE LEVERAGE ADJUSTMENT 
 Percent
 of Weighted
 Amount Total Cost Cost 
GTSW Common Equity $ 317,350,000 28.78% 14.00% 4.03%
GTE Long-Term Debt 63,214,000 5.73 7.72 .44
GTE Short-Term Debt 35,041,000 3.18 13.68 .44
GTE Preferred Stock 31,691,000 2.87 8.78 .25
GTSW Long-Term Debt 497,481,000 45.11 8.54 3.85
GTSW Short-Term Debt 77,829,000 7.06 14.07 .99
GTSW Preferred Stock 80,218,000 7.27 8.39 .61
 ______________ _______ _______
 Total $1,102,824,000 100.00% 10.61%
 ============== ======= =======

When applied to the Commission's jurisdictional rate base determination of $703,041,022, the 10.61 percent rate of return calculated from the consolidated capital structure yielded a revenue requirement which is $7,162,836 less than that produced using an 11.13 percent rate of return.
This $7,162,836 figure plus the $3,778,112 resulting from the application of double leverage methodology to appellant's federal income interest deduction yields the $10,940,948 in revenues that appellant claims it was denied by the Commission's actions.

$703,041,022 × 11.13% = $78,248,466
 703,041,022 × 10.61% = 74,592,652
 ___________
 $ 3,655,814
 1.9593
 ___________
 $ 7,162,836

[2] City of Corpus Christi v. Public Utility Commission, 572 S.W.2d 290 (Tex.1978).
[3] State v. Maurtz-Wells Co., 175 S.W.2d 238 (Tex.1943).
[4] Fairchild, Estimating the Cost of Equity to Texas Public Utilities Companies, Doctoral Dissertation, University of Texas at Austin (May 1980).
[5] Re Blackstone Valley Electric Co., 24 Pub. Util.Rep. 4th 309 (R.I.P.U.C.1978); Re Southern Bell Tel. and Tel. Co., 35 Pub.Util.Rep. 4th 1 (S.C.P.S.C.1980); New England Tel. and Tel. Co. v. Maine Public Utilities Commission, 390 A.2d 8 (Maine 1978) (the Maine Supreme Court recognized the validity of double leverage techniques but held them inapplicable to New England Telephone and Telegraph because of outstanding minority shareholdings which were publicly traded); South Cent. Bell Tel. Co. v. Louisiana Pub. Serv. Comm., 352 So.2d 964 (La.1977); Re Central Tel. Co. of Virginia, 25 Pub.Util.Rep. 4th 422 (Va.St.Corp.Com'n.1978); Re Wisconsin Tel. Co., 25 Pub.Util.Rep. 4th 508 (Wis.P.S.C.1978); Re South Central Bell Tel. Co., 22 Pub.Util.Rep. 4th 257 (Tenn.P.S.C. 1977); Massachusetts Elec. Co. v. Department of Public Utilities, 381 N.E.2d 325 (Mass.1978) (the Massachusetts Supreme Court rejected double leverage treatment based upon the record in this case but recognized its validity in other cases where the record supported its use); United Tel. Co. of Iowa v. Iowa State Comm., 257 N.W.2d 466 (Iowa 1977); City of Pittsburg, Pennsylvania v. Pennsylvania Pub. Util. Comm., 126 A.2d 777 (Pa.1956); Re Boise Water Corp., 10 Pub.Util.Rep. 4th 424 (Idaho 1975); Re United Tel. Co. of New Jersey, 2 Pub.Util.Rep. 4th 299 (N.J.P.S.C.1974); Potomac Edison Co. v. Maryland Pub. Serv. Comm., 279 Md. 573, 369 A.2d 1035 (1977); Re Mountain States Tel. and Tel. Co., 38 Pub.Util.Rep. 4th 182 (M.P.S.C.1980); Re General Tel. Co. of the Southwest, Docket No. 937 (N.M.St.Corp. Comm.1981).
[6] Sec. 67:

The commission or railroad commission shall have jurisdiction over affiliated interests having transactions with public utilities under the jurisdiction of the commission or railroad commission to the extent of access to all accounts and records of such affiliated interests relating to such transactions, including but in no way limited to accounts and records of joint or general expenses, any portion of which may be applicable to such transactions.
[7] Grosjean v. American Press Co., Inc., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936); Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898).
[8] United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960); Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958).
[9] Appellants then cite: F. S. Royster Guano Co. v. Virginia, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920); Louisville Gas & Electric Co. v. Coleman, 277 U.S. 32, 48 S.Ct. 423, 72 L.Ed. 770 (1938); Smith v. Cahoon, 283 U.S. 553, 51 S.Ct. 582, 75 L.Ed. 1264 (1931); Hartford Steam Boiler Inspection & Ins. Co. v. Harrison, 301 U.S. 459, 57 S.Ct. 838, 81 L.Ed. 1223 (1937); Gulf, Colo. and Santa Fe Ry. v. Ellis, 165 U.S. 150, 17 S.Ct. 255, 41 L.Ed. 666 (1897) among others.
[10] Frank v. Latham, 145 Tex. 30, 193 S.W.2d 671 (1946).