SW BELL-rehearing 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 



ON MOTION FOR REHEARING


 





NO. 3-92-065-CV





CITIES OF ABILENE, ET AL.,



 APPELLANTS


vs.




PUBLIC UTILITY COMMISSION OF TEXAS, ET AL.,



 APPELLEES


 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT



NO. 91-3089, HONORABLE JOE B. DIBRELL, JUDGE PRESIDING



 





 The opinion and judgment of the Court in this cause handed down on February 3,
1993, are withdrawn and the following opinion is substituted therefor.

 Appellants (1) sought judicial review of the Public Utility Commission's (the
"Commission") final order in a rate case concerning Southwestern Bell Telephone Company ("SW
Bell") and other entities. (2) The district court affirmed the Commission's order, and the appellants
seek reversal of the district court's judgment. While the Commission's order is predominantly
correct, we conclude the Commission did not correctly apply the law as to income-tax savings
resulting from expenses disallowed for ratemaking purposes. We will reverse the district court's
judgment and remand the cause to the district court with instructions that it be remanded to the
Commission for proceedings consistent with our opinion.



PROCEDURAL BACKGROUND



 The Commission initiated the agency proceeding as an inquiry into the
reasonableness of SW Bell's existing rates pursuant to section 42 of the Public Utility Regulatory
Act ("PURA"), Tex. Rev. Civ. Stat. Ann. art. 1446c, § 42 (West Supp. 1993). The primary
impetus for this rate case was consumer group concern that utility tax savings resulting from the
Tax Reform Act of 1986 were not being passed through to ratepayers and that SW Bell was
realizing excessive profits.

 In January 1989, the Commission initiated the rate case as Inquiry of the General
Counsel Into the Reasonableness of the Rates and Services of Southwestern Bell Telephone
Company, Docket No. 8585. (3) The Commission directed SW Bell to file a "rate-filing package"
based on 1988 as the test year. SW Bell also submitted a proposal for resolution of the rate case,
its "Texas First Plan." The parties conducted extensive discovery and filed written testimony
supporting their various positions in advance of any hearing. (4)

 Before the date set for the cost-of-service hearing, SW Bell, the Commission staff,
and twenty-four other parties entered into a non-unanimous stipulation. This stipulation provided,
in part, for rate reductions of approximately $73 million annually and upgrades in SW Bell
services and facilities. The signatory parties presented the stipulation to the Commission for
consideration as the basis for setting the rates at issue and filed written testimony in support of
the stipulation provisions. The Office of Public Utility Counsel ("OPC"), a group of one hundred
and fourteen Texas cities ("Cities"), the City of McKinney ("McKinney"), and several other
intervenors opposed adoption of the stipulation.

 To establish the procedure for the consideration of the stipulation, the Commission
ordered that an initial hearing be conducted solely on the issue whether the stipulation should be
adopted. If the Commission rejected the stipulation, the order provided that a full cost-of-service
hearing would be held to set just and reasonable rates and that the parties to the stipulation would
be free to pursue their previous positions. The Commission allowed all parties to conduct
additional discovery and file additional written testimony before the stipulation hearing. At the
conclusion of the stipulation hearing, the administrative law judge recommended that the
Commission reject the stipulation because of SW Bell's failure to present evidence on its cost of
service and invested capital. The Commission, however, adopted the stipulation with some minor
modifications in its final order.

 After exhausting their administrative remedies, the appellants sought judicial review
in the district court of Travis County pursuant to section 69 of PURA and section 19 of the
Administrative Procedure and Texas Register Act ("APTRA"), Tex. Rev. Civ. Stat. Ann. art.
6252-13a, § 19 (West Supp. 1993). The trial court affirmed the final order of the Commission
adopting the stipulation. The Cities, OPC, and McKinney appeal the judgment of the trial court.



THE STIPULATION PLAN


 The stipulation, as adopted by the Commission, provided for a mix of rate
reductions and other benefits to consumers. Under the stipulation, SW Bell would (1) provide a
one-time credit to residential customers, (2) reduce certain other rates, including long distance
access charges, and (3) upgrade SW Bell facilities and services. The stipulation also set up an
"earnings sharing" plan, whereby SW Bell would return to consumers fifty percent of earnings
within a specified range and one hundred percent of earnings above that range. Additionally,
certain SW Bell rates were subject to a four-year "rate cap."



THE DISPUTE



 On appeal, the Cities and OPC complain of (1) the adoption of the non-unanimous
stipulation as the basis for the Commission's order; (2) the sufficiency of the evidence to support
the finding of a reasonable rate of return; (3) the consideration of the test-year cost-of-service data
in setting rates; (4) the implementation of the "earnings sharing" plan; (5) the inclusion of a
hypothetical federal income tax expense in cost of service; and (6) the inclusion of inappropriate
affiliate expenses in cost of service. By separate points, McKinney complains of the "extended
metropolitan service" rates set by the stipulation and the Commission's order.



DISCUSSION AND HOLDING



 In Texas, utility rates are set by the same test whether a utility seeks a rate increase
or outside entities seek a rate decrease. See PURA §§ 42, 43. In both instances, the utility bears
the burden of proof to show just and reasonable rates. PURA § 40(b); Suburban Util. Corp. v.
Public Util. Comm'n, 652 S.W.2d 358, 366 (Tex. 1983). The establishment of just and
reasonable rates requires consideration of three factors: (1) the utility's reasonable operating
expenses; (2) the utility's rate base; and (3) the reasonable rate of return. PURA § 39. A
regulated utility is entitled to rates that provide a "reasonable opportunity to earn a reasonable
return on its invested capital . . . ." PURA § 39(a); see Suburban Util. Corp., 652 S.W.2d at
362.

 Rates are set in a two-step process. First, the overall revenue the utility is entitled
to recover is set, a process often referred to as setting "revenue requirements." Second, a "rate
design" of individual rates for classifications of customers and services is determined. See Texas
Alarm & Signal Ass'n v. Public Util. Comm'n, 603 S.W.2d 766, 768 n.2 (Tex. 1980). The Cities
and OPC complain of the operating-expense and rate-of-return elements of the revenue-requirement determination, while McKinney complains of the rate design as applied to its
residents.

 In reviewing an agency order, we may not substitute our discretion or judgment
for that of the agency; we may reverse the agency's decision only if it is not supported by
substantial evidence, is arbitrary, or results from an abuse of discretion. Railroad Comm'n v.
Continental Bus Sys., Inc., 616 S.W.2d 179, 181 (Tex. 1981). An agency's decision is arbitrary
or results from an abuse of discretion if the agency has (1) failed to consider a factor the
legislature directed it to consider, (2) relied upon an irrelevant factor, or (3) weighed only relevant
factors that the legislature directed it to consider but still reached a completely unreasonable
result. Gerst v. Nixon, 411 S.W.2d 350, 360, n.8 (Tex. 1966); Statewide Convoy Transp., Inc.
v. Railroad Comm'n, 753 S.W.2d 800, 804 (Tex. App.--Austin 1988, no writ).



Adoption of the Non-Unanimous Stipulation



 The Cities' first point of error and OPC's first and eighth points of error complain
of the Commission's adoption of the non-unanimous stipulation. The Cities and OPC argue that
the Commission (1) failed to consider the statutory factors in setting rates; (2) considered
irrelevant nonstatutory factors in setting rates; (3) failed to make an evaluation of SW Bell's
reasonable and necessary expenses; (4) made improper implied adjustments to test-year data; and
(5) in considering the stipulation, used a procedure that was not proper under PURA and that
violated due-process principles.

 We recently considered the adoption of a non-unanimous stipulation in a rate case. 
See City of El Paso v. Public Util. Comm'n, 839 S.W.2d 895 (Tex. App.--Austin 1992, writ
requested). In City of El Paso we determined that a non-unanimous stipulation could be
considered as a basis for a final order in a rate case as long as nonstipulating parties had an
opportunity to be heard on the merits of the stipulation and the Commission made an independent
finding on the merits, supported by substantial evidence in the record, that the stipulation set just
and reasonable rates. Id. at 903. The consideration of a non-unanimous stipulation as a basis for
the final order is proper unless it is "arbitrary, unreasonable, an abuse of discretion, or involves
consideration of factors other than those the legislature has directed the Commission to consider." 
Id. at 904.

 In their arguments that the Commission failed to consider statutory factors,
considered irrelevant factors, failed to analyze SW Bell's operating expenses, and made improper
adjustments to test-year data, the Cities and OPC essentially contend, that in adopting the
stipulation, the Commission did not conduct the analysis PURA requires in rate cases. In City
of El Paso we stated:



[A]ppellants impliedly urge us to presume that, by basing its final order partially
on stipulated matters, the Commission completely abdicated its responsibility to
determine disputed issues. We may not so presume; indeed, the law compels a
contrary presumption. In reviewing a challenged administrative order, we must
presume its validity. The challenger bears the burden of showing error.



Id. at 902 (citations omitted). We believe this statement applies equally in the immediate case. 
The Cities and OPC complain that the Commission did not conduct a line-by-line cost-of-service
analysis in setting SW Bell rates. However, the record reflects that all parties presented evidence
and that the Commission made findings of fact on the relevant issues. We find nothing in the
record to compel the conclusion that the Commission failed to properly discharge its statutory
duties.

 The Cities and OPC argue that the Commission findings were not based on any real
evidence. Rather than rely on the pre-filed testimony and SW Bell's rate-filing package, the
signatory parties to the stipulation jointly offered new written testimony to support the stipulation. 
The Cities and OPC argue that this evidence reflects artificial numbers generated to support the
stipulation. However, that contention, if assumed true, does not negate the probative value of the
evidence. It would be as artificial to require the stipulating parties to argue their prior extreme
positions in support of compromise numbers. The Commission recognized this situation and
ordered that the signatory parties be grouped as one party for briefing, presentation of witnesses,
and cross-examination at the stipulation hearing. The opponents to the stipulation were given a
full opportunity to present evidence to contradict the stipulation and to refute the evidence
presented to support its adoption.

 In reviewing the sufficiency of the evidence to support an agency order, we apply
the substantial-evidence test. This Court has extensively discussed the substantial evidence test
in Lone Star Salt Water Disposal Co. v. Railroad Commission, 800 S.W.2d 924, 928
(Tex.App.--Austin 1990, no writ):



To determine whether an agency's decision is supported by substantial evidence,
as APTRA § 19(e)(5) requires, we must determine whether, in considering the
record upon which the decision is based, the evidence as a whole is such that
reasonable minds could have reached the conclusion which the Commission must
have reached in order to justify its action. In determining whether there is
substantial evidence to support the order, the reviewing court may not substitute
its judgment for the Commission's, and must consider only the record upon which
the decision is based. The evidence in the agency record may actually
preponderate against the Commission's decision, but still amount to substantial
evidence supporting it. The burden is on the complaining party to demonstrate an
absence of substantial evidence.


 Final orders of the Commission are presumed to be valid. Where the
evidence in the record before an agency will support either an affirmative or a
negative finding, the agency order must be upheld. Any conflict in the evidence
must be resolved in favor of the agency's decision. (Citations omitted.)



The stipulation itself and the testimony offered to support a finding that rates were just and
reasonable under the stipulation constitute substantial evidence. City of El Paso, 839 S.W.2d at
907. Evidence was presented supporting either adoption or rejection of the stipulation. We may
not substitute our judgment on the weight and credibility of the evidence for that of the
Commission. APTRA § 19(e).

 The Cities also complain that the procedure the Commission used in considering
the stipulation denied the stipulation opponents due process. Appellants argue that the hearing,
being limited to the issue of whether to accept or reject the stipulation, denied the opponents the
opportunity to present their proposals for consideration.

 The adoption of a non-unanimous stipulation raises several due-process concerns. 
The most obvious is the possibility that opposing parties may be denied an opportunity to present
evidence against acceptance of the stipulation. A more subtle problem is the possibility of an
unintentional shift of the burden of proof from the utility to the opponents of the stipulation. 
There is a danger that when presented with a ready-made solution, the Commission might
unconsciously require that the opponents refute the agreement, rather than require the utility to
prove affirmatively that the proposed rates are just and reasonable. This danger is increased when
the Commission staff is a signatory party and is in a position of advocating the stipulation.

 In City of El Paso and in Mobil Oil Corp. v. Federal Power Commission, 417 U.S.
283 (1974), the procedural facts are somewhat distinguishable from the instant case. In both City
of El Paso and Mobil, the stipulations were negotiated only after extended litigation, and extensive
hearings on the merits preceded the hearings for adoption of the stipulations. In City of El Paso,
the rate case was initially divided into three phases--revenue requirement, prudence review of a
nuclear project, and rate design. In that case, a fourth phase was later added to consider the
stipulation. In the immediate case, however, the chronology was reversed; the stipulation hearing
was a preliminary matter. The Commission's order provided that in the event that the stipulation
was rejected, the parties would return to their pre-stipulation positions and the hearing would
begin anew as an ordinary rate case. Nonetheless, the opponents had a full opportunity to present
evidence on all issues at the hearing on the stipulation. We conclude that in the immediate case
the procedural distinction does not compel a result different from our decision in City of El Paso.

 The Cities cite a Missouri case for the proposition that the limited hearing violates
due process. See State ex rel. Fisher v. Public Serv. Comm'n, 645 S.W.2d 39 (Mo. Ct. App.
1982). The Fisher case presents a similar procedural history of a preliminary hearing to consider
a non-unanimous stipulation in a rate case. That hearing was also limited to a determination of
acceptance or rejection of the stipulation. The court determined that the opponents did not have
an opportunity to present any positions which could be adopted at the stipulation hearing and,
thus, were denied due process. We do not find this rationale compelling. Clearly, in the
immediate cause, the opponents to the stipulation were able to present their positions that the
stipulation should be rejected and greater rate reductions ordered fully. The opponents were given
the opportunity to present the entirety of their case at the stipulation hearing. Only the scope of
the Commission's decision was limited. The procedure used in this case offered adequate
opportunity for all parties to present their positions for the Commission's consideration. We
reject the rationale in Fisher and reaffirm our test in City of El Paso.

 In their motion for rehearing, the Cities cite a recent Texas Supreme Court case
finding a Mary Carter agreement void as violative of public policy and argue that the stated policy
disfavoring agreements which promote rather than discourage further litigation should apply to
the stipulation in this cause. (5) See Elbaor v. Smith, 845 S.W.2d 240, 247-52 (Tex. 1992). We
disagree. The stipulation in this cause is not a Mary Carter agreement. Nor do we believe the
stipulation promoted litigation in this cause. We conclude that the policy considerations set out
in Elbaor do not require that the stipulation be rejected.

 The test for the procedural propriety of the consideration of a non-unanimous
stipulation is set out in City of El Paso. The nonsignatory parties must be afforded an opportunity
"to be heard on the merits of the stipulation," and the Commission's order should be based on an
independent finding of just and reasonable rates based on the statutory factors and substantial
evidence. City of El Paso, 839 S.W.2d at 903. In this case after a separate hearing on the
stipulation was set, all parties were allowed additional discovery. At the hearing, the Cities and
OPC presented unrestricted evidence and contentions and were provided the procedural safeguards
mandated by APTRA. The Commission made extensive findings of fact and conclusions of law
to support its ultimate determination that the stipulation resulted in just and reasonable rates. We
conclude that the procedure complied with the City of El Paso criteria. We find nothing in the
record to indicate that the Commission shifted the burden of proof from SW Bell to the stipulation
opponents. The Cities' first point of error and OPC's first and eighth points of error are
overruled.



Rate of Return



 The Cities' third point of error complains of the sufficiency of the evidence to
support the Commission's finding of a reasonable rate of return. The Cities complain that there
was not substantial evidence in the record to support the entire range of return the Commission
awarded. The Commission found that SW Bell's current cost of equity was in a reasonable range
between 11.5 and 13.0 percent and that the range of SW Bell's overall cost of capital between
10.49 percent and 11.36 percent was reasonable. By alternative calculation methods, the
Commission found SW Bell's rate of return on investment under the stipulation to be either 10.86
or 11.20 percent, both within the range found reasonable. The earning-sharing provisions of the
stipulation stated that SW Bell would retain all return on investment up to 12.06 percent (14.2
percent return on equity); would refund 50 percent of return on investment between 12.06 and
14.5 percent (14.2 and 18.41 percent return on equity) to consumers; and would refund 100
percent of any return on investment greater than 14.5 percent (18.41 percent return on equity) to
consumers.

 The Cities argue that, under the stipulation, SW Bell may earn a return on equity
of up to 16.3 percent (6) (13.28 percent return on investment), a rate that exceeds both the adopted
reasonable range ceiling of 13.0 percent and any evidence in the record. This argument ignores
the pro forma nature of ratemaking in which a hypothetical reasonable rate of return is determined
based on adjusted test-year data and future rates set to produce approximately that return. In a
conventional rate case there is no consideration of future changes in the actual rate of return. If
consumer use exceeds projections or operational costs are reduced to create a greater return from
the set rates, the utility retains the entire windfall until the next rate case adjusts the rate of return
and individual rates. The potential of future events which may result in a return greater than the
reasonable rate of return does not make the finding of the reasonable rate of return erroneous or
unsupported by evidence. In the immediate case, the rate of return on investment was set at a rate
the Commission found reasonable, 10.86 or 11.20 percent, depending on the calculation method. 
However, the Commission went on to provide a distribution to the consumers in the event of a
greater return.

 The stipulation itself constitutes evidence. City of El Paso, 839 S.W.2d at 907. 
The signatory parties also presented testimony and evidence to support a finding that the
stipulation provided for just and reasonable rates. We conclude that substantial evidence exists
in the record to support the finding that the stipulation set a reasonable rate of return. We will
not substitute our judgment on the weight of that evidence for that of the Commission. 
Accordingly, we overrule the Cities' third point of error.



Test-Year Expenses



 In its second point of error, the OPC complains that in adopting the 1988 test-year
expenses and in assuming that the stipulation included implied adjustments to these expenses, the
Commission did not properly analyze the expenses as PURA required. The OPC cites Coalition
of Cities for Affordable Utility Rates v. Public Utility Commission, 798 S.W.2d 560, 563 (Tex.
1990), for its holding that "book" expenses carry no presumption that they are reasonable and
necessary and the utility did not carry its burden of proof by merely "opening its books to
inspection." The OPC argues that the Commission could not properly rely on SW Bell's actual
1988 expenses and that, in doing so, the Commission failed to hold SW Bell to its burden of
proof. We disagree.

 The record reflects that the Commission did not blindly accept SW Bell's book
expenses. The Commission examined the evidence and testimony presented on cost of service,
including portions of the rate-filing package, and made adjustments to the book expenses to
conform with the requirements of PURA and to account for the effects of the stipulation. The
opponents were given an opportunity to examine the evidence supporting the stipulation through
discovery and to present evidence and argument against adoption of the stipulation at the hearing. 
We conclude that substantial evidence exists in the record to support the Commission's finding
that the adjusted 1988 test-year expenses represent reasonable SW Bell operating expenses. 
Accordingly, we overrule OPC's second point of error.



Earnings Sharing Plan



 The Cities' fourth point of error and OPC's fifth, sixth, and seventh points of error
complain of the Commission's implementation of an "earnings sharing plan." The Cities and OPC
argue that the plan is not authorized under PURA and that the elements of the plan are not
supported by substantial evidence. The Cities additionally argue that the plan provides for illegal
retroactive refunds, illegally fixes rates for four years, improperly substitutes monitoring for
conventional regulation, and constitutes an advisory opinion in that it allows SW Bell to file for
nonmajor future rate increases without a full rate-filing package. OPC also complains that in
adopting the plan the Commission failed to consider statutory factors and, instead, considered
irrelevant factors.

 The initial question the Cities and OPC raise under these points of error is whether
PURA authorizes the Commission to order an "earning sharing plan." The Cities and OPC
characterize this type of ratemaking as "incentive regulation," and argue that it conflicts with the
cost-of-service-based regulation under PURA and is not authorized. The Cities and OPC rely on
the statement in section 18(e)(1) that "nothing in this section is intended to change the burden of
proof of the local exchange company under Sections 38, 39, 40, and 41 . . . ."

 The policy underlying the earning sharing plan is to promote increased efficiency
in SW Bell's operations. Faced with frozen rates, SW Bell may increase profits by making its
operations more cost efficient. Section 39(b) of PURA authorizes the Commission to consider,
among other factors, "the efficiency of the utility's operations" in setting a reasonable rate of
return on invested capital. Section 18(a) authorizes the Commission to carry out the policies of
protecting "the public interest in having adequate and efficient telecommunications service
available to all citizens . . . at just, fair, and reasonable rates" by nontraditional "regulatory rules,
policies, and principles" as necessitated by the growing and increasingly competitive
telecommunications industry. Additionally, PURA section 2 mandates a balancing of consumer
and utility interests in setting rates.

 We conclude that nothing in the plan or this proceeding has relieved SW Bell of
its burden to show that the proposed rates are just and reasonable. The Commission found that
SW Bell met that burden, and we will not substitute our judgment for that of the Commission.

 OPC argues that the Commission improperly considered nonstatutory factors in
adopting the earnings-sharing provisions. OPC contends that the Commission improperly
considered factors set out in its findings of fact 147 and 150 in adopting the earnings sharing
plan. (7) OPC contends that consideration of these factors violated PURA section 39(b). Section
39(b) sets out factors for the Commission to consider in setting a reasonable return on invested
capital. (8) However, this section does not purport to set out exclusive factors for ratemaking
consideration. Section 39(b) only lists factors to be considered "in addition to other applicable
factors." The Commission made several other findings of fact indicating consideration of
operational efficiency. The Commission found that the earning-sharing provisions would promote
greater efficiency by SW Bell. We believe that the Commission properly considered these factors.

 The Cities and OPC argue that the Commission failed to "fix" a rate of return as
PURA section 39(a) requires. By providing for a range in the earnings sharing plan, the Cities
contend that the Commission failed to fix the reasonable rate of return at an exact point. We do
not believe that section 39(a) requires the Commission to fix an exact rate of return. Section 39(a)
requires that the Commission fix overall revenues at a level that will permit the utility a
reasonable opportunity to earn a reasonable return. (9) The Commission met this requirement by
finding that SW Bell's rate of return on investment was either 10.86 or 11.20 percent under the
two calculation methods, numbers within both the range of evidence and the range of return on
investment the Commission found reasonable. See Public Util. Comm'n v. GTE-SW, 833 S.W.2d
153, 159 (Tex. App.--Austin 1992, writ denied). That the Commission also made provision for
sharing of prospective excess profits does not make this determination invalid. We conclude that
the Commission has satisfied the requirements of section 39(a).

 The Cities contend that the Commission authorized unlawful retroactive ratemaking
by providing for consumer refunds of excess profits. The Cities failed to preserve this error in
its motion for rehearing before the Commission. See APTRA § 16(e); United Sav. Ass'n v.
Vandygriff, 594 S.W.2d 163, 168-70 (Tex. Civ. App.--Austin 1980, writ ref'd n.r.e.).

 The Cities contend that the Commission unlawfully fixed rates for four years. The
stipulation provides that SW Bell could not raise rates on certain basic services for four years and
could not bring a major rate case unless its rate of return on investment fell below 10.49 percent
for a full year. This provision is an integral part of the earnings sharing plan in that it provides
the necessary protection for consumers and fixes a significant portion of SW Bell's revenues so
as to provide an incentive for long-term increases in operational efficiency. The Cities argue that
the stipulation also limits the Commission's power to inquire into unreasonable rates pursuant to
PURA section 42. In making this argument, the Cities refer to paragraph 27 of the stipulation
which provides "[i]f both unforeseen and unusual events act to cause the Stipulation and
Agreement to function in a manner which is contrary to the public interest, the [Commission] or
the parties may seek modification to the Stipulation and Agreement or may initiate a general
inquiry into the reasonableness of [SW Bell's] rates or earnings." (10) Paragraph 27 further states
that the stipulation "will not be modified absent notice, hearing, and a Commission determination
that such modification is in the public interest." The Cities contend that the language "unforeseen
and unusual acts" creates an unlawful threshold to initiation of a section 42 action. We do not
read such a requirement into the provision. Paragraph 27 operates only as an affirmation of the
Commission's authority. The Commission retains full authority to initiate an inquiry into SW
Bell's rates at any time. Additionally, the Cities, OPC, or any other nonsignatory to the
stipulation could bring a PURA section 42 complaint at any time.

 The Cities contend that the Commission improperly substituted monitoring for
regulation and that this allows SW Bell to recover automatically any cost changes during the term
of the stipulation. (11) This argument ignores the situation in the immediate case and in rate cases
in general. In this case, as in ordinary rate cases, rates are fixed until the next rate case. The
inquiry into reasonable operating costs is a "snapshot" inquiry based on the test year. It is not
intended to account for future cost changes. Adjustment for these changes will be made in future
rate cases. While SW Bell is free to incur any additional costs it chooses, it may not recover any
of these additional costs through higher rates absent a proceeding under PURA section 43 and a
Commission order. Additionally, as discussed above, the Commission retains full authority to
initiate an inquiry into the reasonableness of SW Bell's rates pursuant to PURA section 42. We
conclude that the monitoring provisions are in addition to, and do not infringe upon, the
Commission's regulatory powers.

 The Cities argue that the approval of SW Bell's application for nonmajor rate
increases without a full rate-filing package is an improper advisory opinion by the Commission. 
However, the stipulation also authorizes the Commission to require a rate-filing package in any
proceeding if good cause is shown. The distinction between "major" and "nonmajor" rate cases
is supported by PURA section 43(b). We believe that the implementation of procedural provisions
for nonmajor rate cases is within the Commission's discretion. Nothing in the stipulation or the
Commission's order abrogates SW Bell's burden of proof in such cases or operates as a pre-approval of nonmajor rate changes. We conclude that this provisions does not constitute an
advisory opinion.

 We believe that the earnings sharing plan the Commission approved falls within
the type of innovative regulation section 18(a) authorizes and was based on consideration of
proper factors. Given that we have concluded that the Commission properly considered the
statutory factors, we see no conflict between the earnings sharing plan and traditional ratemaking. 
Additionally, we conclude that substantial evidence exists in the record to support each of the
individual elements of the plan. We overrule the Cities' fourth point of error and OPC's fifth,
sixth, and seventh points of error.



Federal Income Tax Expense



 The Cities' second point of error and OPC's third point of error complain of the
Commission's inclusion of a hypothetical federal income tax expense in SW Bell's cost of service. 
The Cities and OPC argue that this tax expense did not reflect the actual tax paid by SW Bell in
that it failed to account for tax savings resulting from (1) the consolidated tax return Southwestern
Bell Corporation ("SBC") filed on behalf of SW Bell and other subsidiaries and (2) deductions
actually taken for expenses the Commission disallowed for ratemaking purposes. The Cities also
argue that the Commission erred in assuming that the stipulated income tax expense implicitly
accounted for SW Bell's tax expense savings resulting from the Tax Reform Act of 1986.

 The standard for the inclusion of a utility's income tax expense in cost of service
is whether the utility actually incurred the expense, i.e., the amount of taxes actually paid. Public
Util. Comm'n v. Houston Lighting & Power Co., 748 S.W.2d 439, 442 (Tex. 1987); GTE-SW,
833 S.W.2d at 163.

 SBC is the parent company of SW Bell. SBC files a consolidated income tax return
for its subsidiary companies, not all of which are regulated utilities. If some of the unregulated
utilities post a net loss, then the total SBC tax bill is reduced. In GTE-SW we held that, under
PURA section 41(c)(2), the Commission must compute the utility's tax savings under a
consolidated tax return to determine if a savings would result and, if so, calculate the utility's "fair
share" of the savings. GTE-SW, 833 S.W.2d at 163. The utility's share of the savings must be
passed on to the ratepayers in lower rates. Id. at 165.

 To support a conclusion, as the Commission made in this case, that no adjustment
to income tax expense is necessary under PURA section 41(c)(2), the Commission is required to
find either (1) that it was not advantageous for the utility to consolidate returns, or (2) that the
Commission has computed taxes as though a consolidated return were filed and the utility had
received its fair share of the savings from the consolidated return. GTE-SW, 833 S.W.2d at 168. 
In GTE-SW we held that the general finding that "no adjustment for a consolidated tax return was
necessary," was insufficient. However, in the immediate case, the Commission went beyond such
a general finding. The Commission made specific underlying fact findings that SBC actually filed
a consolidated return and that SW Bell had received its fair share of the resulting tax savings
pursuant to the tax allocation agreement among the SBC subsidiaries. This indicates that the
Commission reviewed the consolidated return, SW Bell's tax expense, and the tax allocation
agreement and found that SW Bell received its "fair share" of any tax savings. We find
substantial evidence in the record to support this finding. These determinations essentially satisfy
the GTE-SW test, and in any event, we should not be "hypertechnical" in requiring a precise form
of findings of underlying fact. Allied Bank Marble Falls v. State Banking Bd., 748 S.W.2d 447,
448-49 (Tex. 1988). In GTE-SW we held that section 41(c)(2) required that the Commission
impute to the utility its "fair share" of and tax savings resulting from a consolidated return. "Fair
share" is not defined by PURA. Therefore we must conclude that the legislature left this
determination to the discretion of the Commission. The Commission may determine that the
utility's "fair share" is zero, as it did in this proceeding, that the utility is entitled to all tax
savings, or any allocation between these extremes. (12) We do not construe section 41(c)(2) to
require any set allocation of these tax savings. If the Commission's determination is supported
by substantial evidence, there is no error. Therefore, the Commission could reasonably conclude
that no adjustment to SW Bell's income tax expense was necessary to account for the consolidated
return.

 The Texas Supreme Court has held that when a utility claims income tax deductions
for all expenses it has incurred, including expenses disallowed for ratemaking purposes, the
resulting tax savings should inure to the benefit of ratepayers. Houston Lighting & Power, 748
S.W.2d at 442. In GTE-SW we rejected an argument that consideration of the savings resulting
from deductions disallowed for ratemaking purposes would violate section 41(c)(3). GTE-SW,
833 S.W.2d at 169. We concluded that section 41(c)(3) forbids only the passing along disallowed
expenses to ratepayers, not passing through resulting tax savings, and that Houston Lighting &
Power required that all tax savings go to ratepayers, pursuant to section 39 of PURA. Id.

 In the immediate case, the Commission found that an adjustment to income tax
expenses for deductions relating to disallowed expenses would involve an impermissible
consideration of expenses that are excluded from ratemaking as unreasonable or unlawful. This
finding is virtually identical to the reasoning we rejected in GTE-SW. Under the "actual taxes
paid" test, any utility tax savings must benefit ratepayers. Therefore, if SW Bell realized tax
savings resulting from deductions, these savings must apply to reduce rates, even if the underlying
deduction could not be included as expenses in SW Bell's cost of service.

 The appellees have argued that, in the event the Commission erred in calculating
income tax expenses, such error is harmless because the total "benefits" to consumers under the
stipulation plan would far exceed any additional rate reductions necessary to correct the error. (13) 
Appellees contend that the language of APTRA section 19(e) that a cause may be reversed or
remanded "if substantial rights of the appellant have been prejudiced" requires that appellants
show that any error is not offset by the total benefits to ratepayers under the stipulation. We do
not find this argument persuasive, as it presumes that the effect of any error in calculating cost
of service can be weighed against the total benefits of the stipulation on an incremental basis. 
Although the Commission found that it would require at least an annual rate reductions of $418
million to exceed the stipulation benefits, we do not believe that consumer's rights may be
prejudiced only if the Commission's error in applying the law causes a rate miscalculation in
excess of this amount.

 SW Bell and the Commission have stated that the effect of any error in the
Commission's application of section 41(c)(3) is to overstate SW Bell's tax expense by
approximately $3.23 million ($9.5 million in disallowed expenses multiplied by SW Bell marginal
tax rate of 34%). In its motion for rehearing, SW Bell has urged that this error is harmless
because its return on investment after adjustment for this error will remain within the range the
Commission found reasonable. Whether the error causes the overall rates to be unreasonable is
initially a question for the Commission. In any event, consumers are entitled to rates that reflect
a proper application of the law. Accordingly, a remand to the Commission is proper to determine
what, if any, further rate reductions are due consumers.

 We overrule the Cities' second point of error and OPC's third point of error as to
consolidated tax return savings, but we sustain these points of error as to tax savings resulting
from deductions for disallowed expenses.



Affiliate Expenses



 The Cities' fifth point of error and OPC's fourth point of error complain of the
Commission's inclusion of expenses of SW Bell's transactions with its affiliated companies in its
cost of service. Specifically, the Cities and OPC complain of the inclusion of the costs of SW
Bell's transactions with SBC and Bell Communications Research, Inc. ("Bellcore"). SW Bell is
a wholly-owned subsidiary of SBC, which provides certain centralized services to its subsidiaries. 
SW Bell is a co-owner with other SBC subsidiaries of Bellcore, which conducts research and
development work for its owners and other affiliated companies. The Cities also complain that
SW Bell has failed to prove the reasonableness and necessity of its yellow pages expenses.

 As to SBC and Bellcore expenses, the Cities and OPC complain that the
Commission failed to make underlying findings of fact to support its ultimate findings that the
prices SW Bell paid were no greater than the prices charged to other affiliates. The Cities and
OPC failed to urge this error in their motions for rehearing in the Commission; therefore, this
complaint is waived. See APTRA § 16(e); United Sav. Ass'n, 594 S.W.2d at 168-70. The Cities
also argue that the Commission should have gone further in setting out its rationale for rejecting
the hearing examiner's recommendation for disallowance of a portion of the expenses. (14) We are
aware of no requirement under PURA or APTRA for such findings of fact. The Commission is
within its discretion to accept or reject recommendations of its hearing examiners.

 PURA section 41(c)(1) requires that payments to an affiliate be reasonable and
necessary. In determining that the expenses of transactions with affiliated companies are
reasonable and necessary, the Commission must make subsidiary findings that (1) each item or
class of items is "reasonable and necessary" and (2) the price paid by the utility is no higher than
the prices charged to other affiliates or unaffiliated persons. GTE-SW, 833 S.W.2d at 160. The
Cities and OPC contend that the Commission failed to make these findings.

 The Cities and OPC contend, as to the SBC expenses, that (1) the Commission
failed to make a finding that the allocation of costs among SBC subsidiaries reflects the costs and
the relative benefits to each subsidiary, (2) the Commission included in the SBC allocation
expenses which could not be allowed for ratemaking, and (3) the Commission failed to make a
finding that each item of SBC expenses is reasonable and necessary.

 SBC expenses are allocated to affiliates by four methods: direct billing, employee-factor allocation, investment-factor allocation, and general-factor allocation. The Commission
made a finding of fact that each of the allocation methods resulted in costs no higher than costs
to other affiliates. The Commission also found that each of the methods produced "a reasonable
result based on cost causation and benefit received" and that the services provided by SBC were
charged to its subsidiaries at cost.

 The Commission found that the SBC expenses had been adjusted by the removal
of legislative advocacy, advertising, and membership expenses. The Commission found that the
majority of services SBC provided were nondiscretionary and that economies of scale produced
benefits by grouping these activities in a central entity. These findings could reasonably lead to
the Commission's conclusion of law that SW Bell had met its burden of proof that its SBC
expenses were reasonable and necessary. We conclude that, as to the SBC expenses, the
Commission made all findings required by section 41(c)(1).

 As to Bellcore, the Cities and OPC argue that the Commission failed to make the
required findings to support allowance of these expenses. The Commission made findings of fact
that each of Bellcore's projects was "reasonable and necessary" and that charges to SW Bell were
no higher than the charges to the other co-owners of Bellcore or unaffiliated third parties. We
conclude that the Commission satisfied the requirements of section 41(c)(1). See GTE-SW, 833
S.W.2d at 160-61.

 Additionally, the Cities complain that SW Bell failed to prove the reasonableness
and necessity of its yellow pages expenses. Pre-tax revenues of yellow pages affiliates are
imputed to the regulated utility for ratemaking purposes. Generally, the Commission has required
this adjustment to avoid the possibility of advertising profits being protected in an unregulated
subsidiary. The Cities allege that the amount of yellow pages income imputed to SW Bell should
have been greater and that the Commission failed to comply with the findings requirement of
PURA section 41(c)(1). By its terms, section 41(c)(1) applies only to transactions whereby the
utility purchases "services, . . . property, right or thing . . ." from an affiliate. See General Tel.
Co. of the S.W. v. Public Util. Comm'n, 628 S.W.2d 832, 840 (Tex. App.--Austin 1982, writ ref'd
n.r.e.). While SW Bell does purchase other services from its yellow pages affiliate, Southwestern
Bell Publications ("Yellow Pages"), (15) none of the services purchased are those complained of on
appeal. SW Bell does not purchase any goods or services in connection with the publication of
yellow pages directories. Therefore, the section 41(c)(1) requirements do not apply to the internal
expenses of Yellow Pages. We conclude that it was not necessary for the Commission to make
the findings of fact otherwise required by section 41(c)(1) as to the imputation of Yellow Pages
revenue to SW Bell.

 The Cities also argue that SW Bell failed to present sufficient evidence to support
a finding on the reasonableness of Yellow Pages expenses. The record reflects substantial
evidence that Yellow Pages expenses were reasonable and necessary. We will not substitute our
judgment on this evidence for that of the Commission. For the above reasons, we overrule the
Cities' fifth point of error and OPC's fourth point of error.



McKinney Extended Metropolitan Service



 McKinney complains by five separate points of error of the provisions of the
Commission's order setting SW Bell rates applicable to McKinney residents for extended
metropolitan service ("EMS"). EMS is an optional service whereby customers in outlying
exchanges surrounding a large metropolitan area may pay a fixed rate for what would otherwise
be long-distance calls within that metropolitan area. (16) McKinney complains of the failure of the
Commission to state underlying findings of fact and the sufficiency of the evidence to support the
Commission's findings (1) that existing SW Bell EMS rates were just and reasonable and not
discriminatory; (2) that the application of the existing SW Bell EMS rates to McKinney and other
exchanges was just and reasonable; (3) that the EMS rates set out in the stipulation were not
unreasonably discriminatory; and (4) that identical EMS rates should be set for companies other
than SW Bell. (17) McKinney also complains of the sufficiency of the evidence to support the
Commission's rate group reclassification of the McKinney exchange. Each of McKinney's
complaints attack the rate-design portion of the Commission's decision.

 In its first two points of error, McKinney argues that the Commission failed to
make underlying findings of fact to support its conclusions that SW Bell's existing EMS rates
were just, reasonable, and not discriminatory, and that it was just and reasonable to apply these
rates to twenty-two additional exchanges, including McKinney, as set out in the stipulation. When
an ultimate finding of fact is set forth in statutory language, it must be accompanied by a statement
of underlying facts. APTRA § 16(b); Texas Health Facilities Comm'n v. Charter Medical-Dallas,
Inc., 665 S.W.2d 446, 452 (Tex. 1984). Assuming, without deciding, that the findings McKinney
complains of are ultimate findings of fact, we conclude that the Commission made adequate
underlying findings. In Charter Medical, the Texas Supreme Court set out the criteria to examine
findings of underlying fact:



1. the findings must be clear, specific, non-conclusory, and supportive of the
findings of ultimate facts on the statutory criteria;


2. mere recitals of testimony or references to or summations of the evidence are
improper;


3. the findings must be stated as the agency's findings; and


4. the findings must relate to material basic facts and relate to the findings of
ultimate fact that they accompany.



Charter Medical, 665 S.W.2d at 451-52. However, in applying these standards we should not
be "hypertechnical" in requiring a precise form of findings of underlying fact. Allied Bank
Marble Falls, 748 S.W.2d at 448-49. To support its conclusions of law on the EMS rate design,
the Commission made numerous findings of underlying fact including the following:



231. The rate design objectives of promoting universal service, encouraging
further development of the Information Age in Texas and promoting equal
opportunities for competitors were utilized by the Staff in evaluating the
Stipulation rate design.

. . . . 


234. The Commission Staff has thoroughly reviewed the rate design proposals
contained in the Stipulation in light of the major policy provisions of PURA
and the rate design goals of the Staff.

. . . . 


412. There is a strong demand for expanding calling scopes as evidenced by the
numerous requests pending before the Commission for Extended Area
Service (EAS).


413. The EMS provisions of the Stipulation allow the Commission to address a
number of EAS issues and significantly reduce the backlog of EAS requests
pending before the Commission.


414. The expansion of optional, two-way, flat rate calling in the metropolitan
areas will promote both the economic and social interests of the
communities.


415. The Stipulation will provide EMS to the following 22 [SW Bell] exchanges
. . . Tier II . . . McKinney . . . .

. . . . 


418. The rates for the 22 [SW Bell] exchanges receiving EMS pursuant to the
Stipulation will be identical to the rates for the 19 [SW Bell] exchanges that
are currently receiving EMS. These rates are as follows: . . . .


419. Establishing rates at such levels will promote rate uniformity for customers
in similarly situated exchanges.


420. Tier I exchanges are contiguous to a Metropolitan calling area while Tier
II are not. There is a proportionate relationship between the distances of
the Tier I and Tier II exchanges to their respective metropolitan exchange
and the EMS rate levels for the Tier I and Tier II exchanges.


421. There is insufficient evidence in the record to permit the Commission to set
exchange-specific or metropolitan-specific rates in accordance with Section
23.49 of the Substantive Rules for the 22 [SW Bell] exchanges that will
receive EMS pursuant to the Stipulation, or for the 19 [SW Bell] exchanges
that presently have EMS.



The Commission enjoys broad discretion in determining whether a rate design results in just,
reasonable, nondiscriminatory rates. City of El Paso, 839 S.W.2d at 932. As stated in Texas
Alarm & Signal:



In general, § 38 requires rate structures to be just, reasonable, and not
unreasonably discriminatory. This broad standard allows the Public Utility
Commission discretion to determine the method of rate design. It also gives the
Commission the discretion to consider factors other than cost and adjusted values
of property. Rate design is a complex matter that involves many factors.



603 S.W.2d at 772. Absent a showing that the complained-of rates are unreasonably
discriminatory, we will not overturn the Commission's approval of a rate design. Public Util.
Comm'n v. AT&T Communications of the S.W., 777 S.W.2d 363 (Tex. 1989); City of El Paso,
939 S.W.2d at 932. McKinney argues that the Commission improperly failed to consider cost
factors in setting EMS rates, as allegedly required by the policy set out in Rule 23.49. See 16
Tex. Admin. Code § 23.49 (1992). The Texas Supreme Court has rejected the argument that rate
design and individual rates must be based on cost analysis. Texas Alarm & Signal, 603 S.W.2d
at 770; see also City of El Paso, 839 S.W.2d at 933-34. In making a determination of rate design,
"the Commission may consider factors in addition to the cost of providing service, keeping in
mind the overriding considerations of consistency and the utility's burden of proving that its
proposed rates are just and reasonable." City of El Paso, 839 S.W.2d at 932. We conclude that,
empowered with this broad discretion, the Commission could properly base its rate-design
decision on the factors set out in its findings of fact. Additionally, the enumerated findings of fact
reasonably support the Commission's conclusions in setting EMS rates applicable to McKinney
and otherwise satisfy the Charter Medical criteria. 

 McKinney also complains of the sufficiency of the evidence to support these
findings. Under the substantial-evidence test set out above, we conclude that, based on the
evidence in the record, the Commission could reasonably have found that existing EMS rates were
just, reasonable, and not unduly discriminatory, and that application of the existing rates to
McKinney was just and reasonable. We overrule McKinney's first and second points of error.

 McKinney's third point of error complains that there were no underlying findings
of fact and insufficient evidence to support the placement of the McKinney exchange in Tier II
for EMS rate purposes. McKinney argues that the only evidence in the record supports placing
it in Tier I. The criteria used in placing exchanges in Tiers I or II was contiguity with a metro
exchange. By placing McKinney in Tier II, the Commission impliedly found it was not
contiguous to a metro exchange. The record shows a factual dispute whether McKinney meets
the criteria for a Tier I exchange. This issue was resolve by the Commission. McKinney also
complains that the Commission's finding that the differential between Tier I and Tier II rates was
reasonable and not unreasonably discriminatory is not supported by substantial evidence. We note
that "[e]xisting classification schemes previously approved by the Commission are, prima facie,
not unreasonably discriminatory, and the complaining party has the burden of proving that the
classification produces unreasonably discriminatory rates." City of El Paso, 938 S.W.2d at 932-33. We find substantial evidence in the record to support the conclusion that the Tier I - Tier II
differential is reasonable and not discriminatory. We overrule McKinney's third point of error.

 In its fourth point of error, McKinney complains of the sufficiency of the evidence
to support the rate group reclassification of the McKinney exchange. The exchange rate group
classification determines local exchange rates and is based upon the number of subscribers within
the local exchange. The Commission found that the "rate group reclassifications proposed in this
Stipulation are supported by the evidence and are reasonable." We conclude that substantial
evidence exists in the record to support this finding. Accordingly, we overrule McKinney's fourth
point of error.

 In its fifth point of error, McKinney complains that the Commission's approval of
EMS rates for four local telephone companies (18) other than SW Bell was not supported by
underlying findings of fact and substantial evidence. We conclude that the Commission made
underlying findings of fact that satisfy the Charter Medical criteria and that substantial evidence
exists in the record to support the application of the SW Bell EMS rates to other companies. We
overrule McKinney's fifth point of error.



CONCLUSION



 We overrule the appellants' points of error with the sole exception of the complaint
that the Commission did not correctly apply the law as to income-tax savings resulting from
expenses disallowed for ratemaking purposes, which we sustain. We therefore reverse the district
court's judgment and we remand the cause to the district court with instructions that the cause be
remanded to the Commission for further proceedings consistent with our opinion.



 Jimmy Carroll, Chief Justice


[Before Chief Justice Carroll, Justices Jones and Kidd]

Reversed and Remanded

Filed: May 5, 1993

[Publish]

1.   Appellants are the Office of Public Utility Counsel, the City of McKinney (appealing
on separate points), and the following Texas cities: Abilene, Alamo, Allen, Alvin, Amarillo,
Amherst, Arlington, Balcones Heights, Bay City, Big Wells, Benbrook, Blue Mound, Borger,
Brackettsville, Breckenridge, Canadian, Cameron, Canyon, Carrizo Springs, Cisco, Clute,
Columbus, Converse, Cotulla, Crane, Crowley, Crystal City, Dalworthington Gardens,
Denison, Double Oak, Eagle Pass, Eagle Lake, Earth, East Mountain, Eastland, Edcouch,
Edgecliff Village, Edinburg, Edna, El Campo, El Paso, Farmersville, Forest Hill, Floydada,
Fort Stockton, Friendswood, Fritch, Garland, Goliad, Gordon, Grand Praire, Groves,
Gruver, Hackberry, Hallsburg, Happy, Harlingen, Hedwig Village, Hereford, Hollywood
Park, Hudson Oaks, Kenefick, Kermit, Kingsville, Lake Tanglewood, Laredo, La Villa,
Longview, Lorenzo, Luling, Marlin, McAllen, Meadow, Mercedes, Mesquite, Midland,
Missouri City, Monahans, Mount Pleasant, New Deal, Noonday, Olton, Palmhurst, Pampa,
Pantego, Paris, Pearsall, Pecan Hill, Plainview, Pharr, Rancho Viejo, Richmond, Rio
Hondo, Rockwall, Rosenberg, San Antonio, San Juan, Schertz, Seminole, Sinton, Slaton,
Stagecoach, The Colony, Thompsons, Timbercreek Canyon, Tiki Village, Tye, Tyler,
University Park, Uvalde, Vega, Waco, White Settlement, and Woodsboro.
2.   Appellees are the Public Utility Commission of Texas, Southwestern Bell Telephone
Company, and the following intervenors: AT&T Communications of the Southwest, Inc.,
Lufkin-Conroe Telephone Exchange, Inc., Central Telephone, General Telephone Company
of the Southwest, Contel of Texas, Inc., Fort Bend Telephone Cooperative, Guadalupe Valley
Telephone Cooperative, MCI Telecommunications, State Purchasing & General Services, and
Texas Statewide Telephone Cooperative, Inc.
3.   In February 1989, this rate case was consolidated with another rate case involving SW
Bell, the Inquiry of the General Counsel Into the WATS Prorate Credit, Docket No. 8212.
4.   The Cities argued for approximately $738 million in rate reductions annually; the OPC
for approximately $595 million in rate reduction annually; and the Commission staff for rate
reductions of approximately $392 million annually. SW Bell's rate filing package asserted
that a rate increase of approximately $139 million annually was appropriate.
5.   A Mary Carter agreement is defined as an agreement whereby a "settling defendant
retains a financial stake in the plaintiff's recovery and remains a party at the trial of the case. 
Elbaor, 845 S.W.2d at 247. 
6.   The Cities calculate this rate as the greatest potential return on equity to SW Bell under
the earnings sharing provisions--all earnings up to 14.2 percent plus 50 percent of earnings
between 14.2 and 18.41 percent. 
7.   These findings of fact state:


147. The earnings thresholds set forth in the Stipulation are reasonable because they
were negotiated by parties having opposing interests, because they are
comparable to the thresholds in similar plans adopted by other jurisdictions,
and because they are well within the range of actual earnings of similar
businesses.


150. What might not be reasonable in the context of a traditional rate case resulting
in the prescription of a new, fixed rate schedule may well be reasonable under
a sharing formula whereby basis [sic] rates are frozen, any improvement in
earnings must be the product of improved efficiency and any gains beyond
specified levels must be shared with customers, thereby resulting in lower
overall rates.
8.   Section 39(b) provides: "In fixing a reasonable return on invested capital, the
regulatory authority shall consider, in addition to other applicable factors, efforts to comply
with the statewide energy plan, the efforts and achievements of such utility in the
conservation of resources, the quality of the utility's services, the efficiency of the utility's
operations, and the quality of the utility's management." Tex. Rev. Civ. Stat. Ann. art.
1446c, § 39(b) (West Supp. 1993).
9.   Section 39(a) provides: "In fixing the rates of a public utility the regulatory authority
shall fix its overall revenues at a level which will permit such utility a reasonable opportunity
to earn a reasonable return on its invested capital used and useful in rendering service to the
public over and above its reasonable and necessary operating expenses." Tex. Rev. Civ. Stat.
Ann. art. 1446c, § 39(a) (West Supp. 1993).
10. [10]  This language of paragraph 27 is essentially duplicated in Commission finding of fact
number 30(y). 
11.   During the term of the stipulation, SW Bell is required to file monthly, quarterly,
semi-annual, and annual reports with the Commission and OPC. These reports are used to
monitor SW Bell's performance and to determine whether earnings sharing is required.
12.   We contrast consolidated return tax savings under section 41(c)(2) with tax savings for
disallowed expenses under section 41(c)(3). Tax savings resulting from the utility's
disallowed expenses directly apply to the utility's tax bill. Tax savings resulting from a
consolidated return attributable to losses posted by unregulated entities, however, require
a Commission determination of the connection of the unregulated entity to the utility and an
allocation of the tax savings based on this connection. 
13.   SW Bell and the Commission have also urged this harmless-error/lack-of-substantial-prejudice argument as to each of the Commission's alleged errors in calculating the cost-of-service errors. Because we resolve these issues on other grounds, we do not reach this
argument under the other points of error.
14.   The Cities also make this argument as to the hearing examiner's recommendation that
yellow pages income imputed to SW Bell be increased.
15.   SW Bell contracted with its yellow pages affiliate for the production, publication, and
delivery of its white pages directories during the 1988 test year. SW Bell also contracted with
Yellow Pages for the sale of white pages bold listings for the 1988 test year. Appellants have
not complained of the inclusion of these expenses in cost of service.
16.   This service is similar to Extended Area Service ("EAS") under 16 Tex. Admin. Code
§ 23.49 (1992).
17.   The Commission's conclusions of law on rate design and EMS issues include the
following: 


44. The rate design and rates resulting from the Stipulation do not grant an
unreasonable preference or advantage, or establish unreasonable differences as
to rates or service between localities or between classes of service.


45. The rates resulting from the Stipulation are just and reasonable and not
unreasonably discriminatory, and are in the public interest.

. . . . 

 

64. [SW Bell's] current EMS rates are just and reasonable and are not
discriminatory.


65. The application of the current EMS rates to the 22 [SW Bell] exchanges to
receive EMS pursuant to the Stipulation is just and reasonable.


66. The approval of the EMS provisions of the Stipulation is in the public interest.

 

67. The differential between the Tier I and Tier II EMS rates is reasonable and not
unreasonably discriminatory.


68. As shown in Finding of Fact Nos. 410-437, making EMS service available on an
optional basis to customers in the ten independent company exchanges
surrounding the [SW Bell] metro exchanges is reasonable and in the public
interest.
18.   GTE Southwest Inc., Lufkin-Conroe Telephone Exchange, Guadalupe Valley
Telephone Cooperative, and Central Texas Telephone Co.